UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| GROTE INDUSTRIES, LLC an Indiana limited liability company, GROTE INDUSTRIES, INC. an Indiana corporation, WILLIAM D. GROTE, III, WILLIAM DOMINIC GROTE, IV, WALTER F. GROTE, JR., MICHAEL R. GROTE, W. FREDERICK GROTE, III, JOHN R. GROTE, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| KATHLEEN  SEBELIUS in her official capacity as Secretary of the United States Department of Health and Human Services, HILDA L. SOLIS in her official capacity as Secretary of the United States Department of Labor, TIMOTHY  GEITHNER in his official capacity as Secretary of the United States Department of the Treasury, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 4:12-cv-00134-SEB-DML |
| Defendants. | ) ) ) | |

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiffs' Motion for Preliminary Injunction [Docket

No. 7], filed on October 30, 2012.  Plaintiffs, Grote Industries, LLC; Grote Industries, Inc.;

William D. Grote III; William Dominic Grote, IV; Walter F. Grote, Jr.; Michael R. Grote; W. Frederick Grote, III; and John R. Grote bring this claim against Kathleen Sebelius in her official capacity as Secretary of the United States Department of Health and Human Services ("HHS'); Hilda S. Solis in her official capacity as Secretary of the United States Department of the Treasury; the United States Department of Health and Human Services; United States Department of Labor; and the United States Department of the Treasury, challenging preventive care coverage regulations ("the mandate") issued under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("Affordable Care Act" or "ACA"), which Plaintiffs allege require them "to pay for and otherwise facilitate the insurance coverage and use of abortifacient drugs, contraception, sterilization, and related education and counseling."  Compl. ¶ 7.  Plaintiffs contend that the mandate violates their statutory rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA") and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*. ("APA") as well as their constitutional rights under the First and Fifth Amendments to the United States Constitution.  Plaintiffs seek both declaratory and injunctive relief.

Presently before the Court is the Plaintiffs' Motion for Preliminary Injunction seeking an order prohibiting Defendants from enforcing the mandate against them and others similarly situated when it goes into effect on January 1, 2012.  After review of the parties' submissions, we <u>DENY</u> Plaintiffs' request for injunctive relief.

## **Factual Background**

The Affordable Care Act, signed into law on March 23, 2010, effected a variety of significant changes to the healthcare system, including in the area of preventive care services.

Section 1001 of the Act, which includes the preventative services coverage provision relevant to the case at bar, requires all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage to provide coverage for certain preventive services without cost-sharing, including, "[for] women, such additional preventive care and screenings … as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. § 300gg-13(a)(4).

The Health Resources and Services Administration ("HRSA") commissioned the Institute of Medicine ("IOM") to develop recommendations for implementing such preventive care for women.  Upon review, the IOM issued a report recommending that the HRSA guidelines include, *inter alia*, "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  INSTITUTE OF MEDICINE, CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 19-20, 109 (2011) ("IOM Report"), *available at* http://iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps/Report-Brief.aspx (last visited December 20, 2012).  Contraceptive methods approved by the Food and Drug Administration ("FDA") include diaphragms, oral contraceptive pills, emergency contraceptives, such as Plan B and Ella, and intrauterine devices.  FDA, Birth Control Guide, *available at* www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf (last visited December 20, 2012).

On August 1, 2011, HRSA adopted IOM's recommendations, subject to an exemption relating to certain religious employers authorized by an amendment to the interim final regulations issued the same day. *See* 76 Fed. Reg. 46621; 45 C.F.R. § 147.130.  On February 15, 2012, HHS, the Department of Labor, and the Department of Treasury published rules finalizing

the HRSA guidelines.  There are certain exemptions to the preventive services provision of the

Affordable Care Act.  Grandfathered health plans, to wit, plans that were in existence on March

23, 2010 and have not undergone any of a defined set of changes, are not subject to the mandate.

*See* 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140.  Certain

religious employers are exempt from providing plans that cover contraceptive services.  To

qualify as a "religious employer" under the exemption, an employer must satisfy the following

criteria:

> (1) The inculcation of religious values is the purpose of the organization. (2) The
> organization primarily employs persons who share the religious tenets of the
> organization. (3) The organization serves primarily persons who share the religious tenets
> of the organization. (4) The organization is a nonprofit organization as described in
> section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of
> 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B).[1]  There is also a temporary enforcement safe-harbor provision

applicable to non-grandfathered group health plans sponsored by certain non-profit organizations

with religious objections to contraceptive coverage (and any associated group health insurance

coverage).  77 Fed. Reg. 8725, 8726-27 (Feb. 15, 2012).  Finally, employers with fewer than

fifty employees are not required to provide any health insurance plan.  26 U.S.C. §

4980H(c)(2)(A).

The individual plaintiffs (collectively, "the Grote Family") are members of a family that

owns and operates Grote Industries, LLC and Grote Industries, Inc. ("Grote Industries"), a

privately held, for-profit business that manufactures vehicle safety systems, headquartered in

Madison, Indiana.  Grote Industries currently employs approximately 464 full-time employees in

the United States.  The members of the Grote Family are believing and practicing Catholic

Christians.  Although Grote Industries is a for-profit, secular corporation, the Grote Family seeks

---

[1] The religious employer exemption was modeled after the religious accommodation used in multiple states already requiring health insurance issuers to cover contraception. 76 Fed. Reg. at 46,623.

to run Grote Industries in a manner that reflects their religious beliefs and believes that their operation of Grote Industries "must be guided by ethical social principles and Catholic religious and moral teachings."  Compl. ¶ 36.  The Grote Family follows the moral teachings of the Catholic Church and "believes that God requires respect for the sanctity of human life and for the procreative and unitive character of the sexual act in marriage."  *Id.* ¶ 4.  The Grote Family "adhere[s] to the centuries-old biblical view of Christians around the world, that every human being is made in the image and likeness of God from the moment of conception/fertilization, and that to help destroy such an innocent being, including in the provision of coverage in health insurance, would be an offense against God."  *Id.* ¶ 5.  Accordingly, the Grote Family believes that "it would be immoral and sinful for them to intentionally participate in, pay for, facilitate, or otherwise support abortifacient drugs,[2] contraception, sterilization, and related education and counseling" as required by the preventive care provision of the Affordable Care Act.  *Id.* ¶ 39.

Consistent with their religious beliefs, the Grote Family provides health insurance benefits to their employees that omit coverage of abortifacient drugs, contraception, and sterilization.  *Id.* ¶¶ 6, 47.  The health insurance plan provided by Grote Industries is self-insured, and the plan year renews each year on January 1.  It is not grandfathered under the Act.  As a secular, for-profit corporation, Grote Industries does not fall within the Act's definition of a "religious employer" and is ineligible for the protection of the safe-harbor provision.  Thus, the mandate takes effect as to the corporation's employee health plan on January 1, 2013.

Plaintiffs contend that Grote Industries is unable to simply avoid the mandate by refusing to provide health care insurance to its employees because it would incur a penalty of approximately $2,000 per employee per year by doing so.  Nor can it continue to offer its current

---

[2] Plaintiffs use the term "abortifacients" to refer to contraceptives which they state "may cause the demise of an already conceived … human embyo."  Pls.' Compl. ¶¶ 54-55.

self-insured plan that omits abortifacients, contraceptives, and sterilization because that course of action would subject Grote Industries to penalties of approximately $100 per employee, per day. If they fail to comply with the mandate, Grote Industries could also be subject to a range of enforcement mechanisms, including civil actions by the Secretary of Labor or by plan participants and beneficiaries.  Plaintiffs seek a preliminary injunction to prevent Defendants from enforcing the mandate against them, arguing that the mandate violates their First and Fifth Amendment rights as well as their statutory rights under the RFRA and the APA.

## Legal Analysis

### I.      Standard of Review

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction.  *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dept. of Health*, 699 F.3d 962, 972 (7th Cir. 2012).  If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbot Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). However, if these threshold conditions are met, the Court must then assess the balance of the harm – the harm to Plaintiffs if the injunction is not issued against the harm to Defendants if it is issued – and determine the effect of an injunction on the public interest.  *Id.*  "The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor."  *Id.* at 1100.

### II.     Discussion

This lawsuit is one of a number of similar suits that have been filed in various venues throughout the country challenging the preventive services coverage provision of the Affordable Care Act.   We have found recent decisions rendered by district courts both in the Seventh Circuit as well as in other circuits to be instructive and find the analysis set forth in *O'Brien v. United States Department of Health and Human Services*, ___ F. Supp. 2d ___, 2012 WL 4481208 (E.D. Mo. Sept. 28, 2012), *appeal docketed*, No. 12-3357 (8th Cir. Oct. 4, 2012),[3] and *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278 (W.D. Okla. 2012), *appeal docketed*, No. 12-6294 (10th Cir. Nov. 20, 2012), particularly persuasive.

In the case at bar, Plaintiffs have advanced numerous theories of relief and the Court is required to address them within a very brief span of time.  The motion for injunctive relief did not become fully briefed until December 6, 2012.  In addition, there is nothing about these complex issues that lends them to superficial review and analysis.  The rulings below reflect our best efforts under these challenging circumstances.

A.        **The Religious Freedom Restoration Act**

The Religious Freedom Restoration Act of 1993 ("RFRA") prohibits the federal government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that the application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a), (b).  RFRA was enacted by Congress in response to

---

[3] In their reply brief, Plaintiffs stress that the district court's order in *O'Brien* was recently stayed pending appeal, in effect granting the plaintiff corporation a preliminary injunction.  *O'Brien v. United States Department of Health and Human Servs.*, No. 12-3357 (8th Cir. Nov. 28, 2012).  Plaintiffs apparently believe that the Eighth Circuit's one-sentence order constitutes a holding that a substantial burden and successful RFRA claim had been found, which, of course it does not.

*Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), where the Supreme Court held that, under the First Amendment, "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Id.* at 879 (internal quotations omitted).  Congress intended RFRA "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened."  42 U.S.C. § 2000bb(b)(1).

In the case at bar, Defendants contend that Grote Industries, as a secular, for-profit corporation, cannot "exercise" a religion, and thus, cannot assert claims under RFRA or the First Amendment Free Exercise Clause.  While we too have doubts regarding whether a secular, for-profit corporation can be deemed to possess free exercise rights as expressed by the district court in *Hobby Lobby*, 870 F. Supp. 2d at 1288, 1291-92 (holding that secular, for-profit corporations do not have rights under the Free Exercise Clause and are not "persons" for purposes of the RFRA), for the reasons detailed below, we find that the preventive services coverage mandate does not place a "substantial burden" on either Grote Industries or the individual plaintiffs, and does not violate Plaintiffs' rights under the Free Exercise Clause.  Thus, we decline to reach the issue of whether a secular, for-profit corporation is capable of exercising a religion within the meaning of RFRA or the First Amendment.

In order to show a likelihood of prevailing on the merits of their RFRA claim, Plaintiffs must initially show that a substantial burden has been placed by the challenged action on their religious exercise.  Under the RFRA, "exercise of religion" is defined broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5.  We do not question that Plaintiffs' religious beliefs are sincerely held.  Nor

8

is it within the purview of this Court to make an assessment as to the centrality of Plaintiffs'

opposition to contraception coverage to their exercise of the Catholic religion, as the RFRA

"makes clear that it does not matter whether the particular exercise of religion at issue is or is not

central to the individual's religious beliefs." *Hobby Lobby*, 870 F. Supp. 2d at 1293 (citing 42

U.S.C. § 2000cc-5(7)(A); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1314 n.6 (10th Cir. 2010),

*cert. denied*, ___ U.S. ___, 131 S.Ct. 469 (2010)); *see also Employment Div. v. Smith*, 494 U.S.

at 887 ("Judging the centrality of different religious practices is akin to the unacceptable

'business of evaluating the relative merits of differing religious claims.'") (quoting *United States

v. Lee*, 455 U.S. 252, 263 n.2 (1982) (Stevens, J., concurring)).  However, the sincerity of one's

beliefs and whether those beliefs have been substantially burdened are two separate inquiries. At

this preliminary stage, Plaintiffs have failed to establish that they have a reasonable likelihood of

establishing that the mandate substantially burdens their practice of religion.

Neither the RFRA nor the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), which adopted RFRA's same "substantial burden" test, defines the term.

However, the Seventh Circuit has held that a substantial burden is "one that necessarily bears a

direct, primary, and fundamental responsibility for rendering religious exercise … effectively

impracticable." *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761 (7th Cir.

2003) (RLUIPA case); *see also Midrash Shephardi, Inc. v. Town of Surfside*, 366 F.3d 1214,

1227 (11th Cir. 2004) ("[A] 'substantial burden' must place more than an inconvenience on

religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the

religious adherent to conform his or her behavior accordingly.").  That sort of direct connection

is missing here.

The conclusion that a substantial burden requires an element of directness is also supported by the free exercise jurisprudence predating *Employment Division v. Smith*. Courts look to such case law in determining whether a particular burden on religious exercise is substantial. *See O'Brien*, 2012 WL 4481208, at *5 (citing *Goodall by Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995) ("[S]ince RFRA does not purport to create a new substantial burden test, we may look to pre-RFRA cases in order to assess the burden on the plaintiffs for their RFRA claim); *Living Water Church of God v. Charter Twp. of Meridian*, 2007 WL 4322157,  at *7 (6th Cir. Dec. 10, 2007) ("Congress has cautioned that we are to interpret 'substantial burden' in line with the Supreme Court's 'Free Exercise' jurisprudence, which suggests that 'substantial burden' is a difficult threshold to cross.")). Two such cases, *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1975), present the test that RFRA was intended to restore and thus are especially relevant. Both cases support the view that the burden on religious exercise "must be more than insignificant or remote." *O'Brien*, 2012 WL 4481208, at *5. The plaintiff in *Sherbert* was forced to "choose between following the precepts of her religion [by resting, and not working on her Sabbath] and forfeiting [unemployment] benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Sherbert*, 374 U.S. at 404. Similarly, in *Yoder*, the state compulsory-attendance law at issue "affirmatively compel[led] [plaintiffs], under threat of criminal sanction, to perform acts undeniably at odds with the fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218.

In line with the analysis set forth in *O'Brien* and *Hobby Lobby*, we conclude that the burden the mandate imposes on Plaintiffs here is likely too remote and attenuated to be considered substantial. As explained in *O'Brien*,

> [T]he challenged regulations do not demand that plaintiffs alter their behavior in a manner that will directly and inevitably prevent plaintiffs from acting in accordance with their religious beliefs. … [P]laintiffs remain free to exercise their religion, by not using contraceptives and by discouraging employees from using contraceptives.  The burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by [the company's] plan, subsidize *someone else's* participation in an activity that is condemned by plaintiffs' religion.  The Court rejects the proposition that requiring indirect financial support of a practice, from which plaintiff himself abstains according to his religious principles, constitutes a substantial burden on plaintiff's religious exercise.

2012 WL 4481208, at *6; *accord Hobby Lobby*, 870 F. Supp. 2d at 1294.  Plaintiffs' advocacy of their beliefs opposing contraceptives can continue much as we assume it did before this statute was enacted.  Since we have not been informed as to Grote Industries's employees' intentions with respect to obtaining such coverage, and have no information with respect to Grote Industries's employment policies, there is no argument or evidence to indicate that any change will necessarily be effected by this statute in terms of Grote Industries's concerns as a self-insured business.

We acknowledge that Plaintiffs object not just to the *use* of contraceptives, but to the *coverage* itself, and thus, argue that the fact that the use of contraceptives depends on the independent decisions of third parties is irrelevant.  But, as recognized in *O'Brien*,

> RFRA is a shield, not a sword.  It protects individuals from substantial burdens on religious exercise that occur when the government coerces action one's religion forbids, or forbids action one's religion requires; it is not a means to force one's religious practices upon others. RFRA does not protect against the slight burden on religious exercise that arises when one's money circuitously flows to support the conduct of other free-exercise-wielding individuals who hold religious beliefs that differ from one's own.

2012 WL 4481208, at *6.  We can imagine a wide variety of individual behaviors that might give rise to religiously-based scruples or opposition, such as alcohol consumption or using drugs or tobacco, or homosexual-related behaviors, all of which can threaten health conditions requiring treatment and care.  If the financial support for health care coverage of which Plaintiffs complain constitutes a substantial burden, secular companies owned by individuals objecting on religious grounds to such behaviors, including those businesses owned by individuals objecting on religious grounds to *all* modern medical care, could seek exemptions from employer-provided health care coverage for a myriad of health care needs, or for that matter, for any health care at all to its employees.  While distinguishable on other grounds, the holding in *Mead v. Holder*, 766 F. Supp. 2d 16 (D.D.C. 2011), rejected a RFRA challenge to the individual mandate of the Affordable Care Act as applied to plaintiffs whose religion forbids seeking medical care.  The court held that the individual mandate's requirement that the plaintiffs contribute to a health care plan that does not align with their religious beliefs "does not rise to the level of a substantial burden … Plaintiffs have failed to allege any facts demonstrating that this conflict is more than a de minimis burden on their Christian faith."  *Id.* at 42.

Nor do we find, particularly on the basis of this preliminary record, that the fact that the group health plan at issue here is self-insured changes our analysis.  Plaintiffs maintain that their self-insured status is determinative because it removes one of the levels of separation discussed in *O'Brien*, resulting in a more direct burden on their religious freedom.  Plaintiffs cite the recent district court decision holding that the mandate substantially burdened the plaintiff's religious exercise under the RFRA, where the fact that the plaintiff corporation was self-insured was a "crucial distinction."  *Tyndale House Publishers, Inc. v. Sebelius*, ___ F. Supp. 2d ___, 2012 WL 5817323, at *13 (D.D.C. Nov. 16, 2012).  *But see Hobby Lobby*, 870 F. Supp. 2d at 23 (holding

that any burden on plaintiffs who were self-insured was too attenuated to be substantial under RFRA).

We disagree with that conclusion.  Regardless of whether the corporation is self-insured, it remains the fact that any burden on Plaintiffs' religious exercise rests on "a series of independent decisions by health care providers and patients covered by [Grote Industries's plan]." *O'Brien*, 2012 WL 4481208, at *6.  Further, even if a health plan is self-insured, it remains a separate legal entity from the sponsoring employer. *See Korte v. U.S. Dept. of Health and Human Servs.*, 2012 WL 6553996, at *9 (S.D.Ill. Dec. 14, 2012) (recognizing that "the RFRA 'substantial burden' inquiry makes clear that business forms and so-called 'legal fictions' cannot be entirely ignored").  Thus, we cannot say, at least without further factual development of the exact structure of Plaintiffs' self-insured plan, that the fact that the plan is self-insured alone bridges the attenuated gap between payment into the fund and the eventual use of the funds discussed in *O'Brien* and *Hobby Lobby*.

Because we are not persuaded that the mandate imposes a substantial burden on Plaintiffs' free exercise of religion, we conclude that Plaintiffs have failed to establish a reasonable likelihood of success on the merits of their RFRA claim, and thus, we need not proceed to determine whether the mandate satisfies strict scrutiny.

### B.        First Amendment – Free Exercise Clause

The Free Exercise Clause of the First Amendment provides that Congress shall make no law "prohibiting the free exercise" of religion.  However, the "right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion

prescribes (or proscribes). *Employment Div. v. Smith*, 494 U.S. at 879 (internal punctuation omitted). In line with the other district courts who have addressed this question and found the mandate neutral and generally applicable, we find that Plaintiffs have failed to establish a reasonable likelihood of success on their free exercise claim.

A law is not neutral if "the object of the law is to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). In determining whether a law has such an impermissible object, courts look to the law's text, legislative history, and the actual effect of the law in operation. *Lukumi*, 508 U.S. at 534, 535, 540. Here, the text of the mandate contains no mention of religion, nor is an impermissible object reflected in the legislative history, as the purpose of the regulations is a secular one, to wit, to promote public health and gender equality.

Although Plaintiffs do not dispute these facts, they contend that the mandate is nonetheless not neutral because the exemption for religious employers divides religious objectors into favored and disfavored groups without any discernible secular reason, exempting "only those religious organizations whose 'purpose' is to inculcate religious values; who 'primarily' employ and serve co-religionists; and who qualify as churches or religious orders under the tax code." Pls.' Br. at 36 (citing 45 C.F.R. § 147.130(a)(iv)(B)(1)-(4)). However, as recognized by the district court in *Hobby Lobby*, "[c]arving out an exemption for defined religious entities does not make a law nonneutral as to others." 870 F. Supp. 2d at 1289. In fact, it tends to support an argument in favor of neutrality. *Id.* ("Using well established criteria to determine eligibility for an exemption based on religious belief, such as the nonsecular nature of the organization and its nonprofit status, the ACA, through its implementing rules and regulations, both recognizes and

14

protects the exercise of religion.") (citing *O'Brien*, 2012 WL 4481208, at *8).  The mandate is not rendered nonneutral merely because the exception does not extend as far as Plaintiffs wish.

To be generally applicable, a law must not "in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543.  Plaintiffs argue that the mandate is not generally applicable because "it exempts 191 million Americans on a variety of grounds."  Pls.' Br. at 37.  Plaintiffs contend that, because the Affordable Care Act provides Defendants "unlimited discretion" to establish and craft exemptions, it deprives the mandate of general applicability.  *Id.* at 37 (citing 42 U.S.C. § 300gg-13).  Again, we disagree.  General applicability does not require universal application and the mandate here does not "pursue[] … governmental interest only against conduct motivated by religious belief." *Lukumi*, 508 U.S. at 545.  As recognized by the district court in *O'Brien*, "[t]he regulations in this case apply to all employers not falling under an exemption, regardless of those employers' personal religious inclinations."  2012 WL 4481208, at *8.  Thus, "it is just not true … that the burdens of the [regulations] fall on religious organizations 'but almost no others.'" *Am. Family Ass'n v. FCC*, 365 F.3d 1156, 1171 (D.C. Cir. 2004) (quoting *Lukumi*, 508 U.S. at 536).

For the foregoing reasons, we hold that there is a substantial likelihood that the mandate will be found to be a neutral law of general applicability that does not offend the First Amendment's Free Exercise Clause.  Accordingly, Plaintiffs have failed to establish a reasonable likelihood of success on this claim.

## C.    First Amendment – Establishment Clause

The "clearest command of the Establishment Clause" is that the government must not show preference to any religious denomination over another. *Larson v. Valente*, 456 U.S. 228,

244 (1982).  The Establishment Clause also protects against "excessive government entanglement with religion."  *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971) (internal quotations omitted).  Plaintiffs contend that the mandate's exemption for "religious employers" violates the First Amendment's Establishment Clause, because it impermissibly "adopt[s] a caste system of different religious organizations and belief-levels" and requires the government to unlawfully scrutinize an organization's religious tenets in determining whether the exemption is applicable.  Pls.' Br. at 38-39.

Here, the religious employer exemption applies equally to all denominations and does not prefer one religion over another or otherwise discriminate among religions.  An employer is eligible for the exemption, regardless of denomination, if its purpose is to inculcate religious values, it primarily employs and serves persons sharing those values, and it is a nonprofit religious organization as defined in certain provisions of the Internal Revenue Code.  45 C.F.R. § 147.130(a)(1)(iv)(B).  It is true, as Plaintiffs allege, that the exemption does differentiate between types of religious organizations based on their structure and purpose.  But the Establishment Clause does not prohibit the government from making such distinctions when granting religious accommodations as long as the distinction drawn by the regulations between exempt and non-exempt entities is not based on religious affiliation.  *See*, *e.g.*, *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970) (rejecting Establishment Clause challenge to law exempting from property taxes property of religious organizations used exclusively for religious worship); *Droz v. Comm'r of IRS*, 48 F.3d 1120, 1124 (9th Cir. 1995) (upholding a Social Security tax exemption only for members of organized religious sects, despite the fact that "some individuals receive exemptions, and other individuals with identical beliefs do not," because the purpose of the exemption was not to discriminate among religious denominations).

16

Given that the exemption's definition of "religious employer" does not refer to any particular denomination, the criteria for the exemption focus on the purpose and structure of the organization rather than its affiliation, and the exemption is available to any and all religions, the mandate clearly does not prefer certain religions over others, and thus, is not likely to be found to violate the Establishment Clause in this manner.

Plaintiffs have also failed to establish any likelihood of success in showing excessive entanglement. Plaintiffs concede that they do not satisfy the non-profit criteria required for religious employer status. Because that alone would disqualify Grote Industries from being a "religious employer" under the exemption's definition, the government would not be required reach an assessment of whether the company's purpose is to inculcate religious values and whether it primarily employs and serves persons sharing those values nor engage in any other inquiry that would pose a potential entanglement issue.

### D.      First Amendment – Free Speech Clause

Plaintiffs allege that the mandate violates their rights protected by the First Amendment's Free Speech Clause by coercing Grote Industries to subsidize speech that is contrary to Plaintiffs' religious beliefs. Specifically, Plaintiffs argue that the mandate compels expressive speech by requiring Grote Industries to cover "education and counseling" that Plaintiffs contend will be in favor of abortifacients.

The First Amendment protects not only the freedom to speak, but also the freedom from compelled speech. *See West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (holding unconstitutional a statute requiring recitation of the pledge of allegiance). It also encompasses the right to refuse financial support to fund speech with which one disagrees.

17

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) (holding a statute requiring mushroom producers to contribute towards advertisements promoting mushroom sales unconstitutional). However, as recognized by the district court in *O'Brien*, the problem with Plaintiffs' argument is that the mandate does not require Plaintiffs to subsidize speech and instead only regulates conduct.  Although it is true that the mandate expressly requires subsidization for education and counseling services and the receipt of health care usually involves a conversation between a doctor and a patient, "this speech is merely incidental to the conduct of receiving health care."[4] *O'Brien*, 2012 WL 4481208 at *12 (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006)).

In assessing the constitutionality of speech subsidies, the Supreme Court has recognized that, "First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors." *United Foods*, 533 U.S. at 411.  However, again, as recognized by the district court in *O'Brien*, here, the subsidized speech "is an unscripted conversation between a doctor and a patient, not political propaganda in favor of one candidate, an amicus brief espousing one side of an issue, or advertisements in favor of a particular product."  2012 WL 4481208, at *12. Although Plaintiffs contend that the subsidy for "education and counseling" the mandate requires them to provide will be "in favor of abortifacients," Plaintiffs simply cannot know this to a certainty.  Adoption of Plaintiffs' argument "would mean that an employer's disagreement with the subject of a discussion between an employee and her physician would be a basis for precluding all government efforts to regulate health coverage."  *Id.*

---

[4] This is another way of saying that there is no substantial burden on religious exercise.

Nor are we convinced by Plaintiffs' argument that the conduct the mandate requires them to subsidize is "inherently expressive" so as to entitle it to First Amendment protection.  *See Rumsfeld*, 547 U.S. at 66.  An employer who provides a health plan which covers contraceptive services along with a myriad of other medical services because it is required by law to do so is simply not engaged in the same type of conduct that the Supreme Court has recognized as inherently expressive.  *Compare id.* at 65-66 (making space for military recruiters on campus is not conduct that indicates a college's support for, or sponsorship of, recruiters' message) *with Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 568-70 (1995) (openly gay, lesbian, and bisexual group marching in parade is expressive conduct) *and Barnette*, 319 U.S. 624 (1943) (refraining from saluting American flag is expressive conduct); *see also O'Brien*, 2012 WL 4481208, at *12 ("Giving or receiving health care is not a statement in the same sense as wearing a black armband or burning an American flag.") (internal citations omitted).

Plaintiffs here remain free to say whatever they would like to express about contraceptives and abortifacients, including to discourage their employees' use of such products and services.  Plaintiffs have failed to persuade us that they have a reasonable likelihood of establishing that the mandate unlawfully compels them to speak, to subsidize speech, or to subsidize expressive conduct in violation of the Free Speech Clause of the First Amendment.

### E.      Fifth Amendment – Due Process

Plaintiffs next allege that the mandate violates the Fifth Amendment's Due Process Clause because it "creates a standardless, blank check for Defendants to discriminatorily select whatever they want to call 'religious' and offer or withhold whatever accommodations they

choose." Pls.' Br. at 40.  Although the exact scope of Plaintiffs' due process challenge is not

entirely clear, it appears Plaintiffs contend that "the statute," 42 U.S.C. § 300gg-13, is

unconstitutionally vague because it contains no standards or guidance regarding "who counts as

religious and what kind of accommodation such religious persons or entities should be

provided." Pls.' Br. at 40.

A law is not unconstitutionally vague unless it "fails to provide a person of ordinary

intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or

encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304

(2008) (citations omitted). It is clear that Plaintiffs are not suffering from any misapprehensions

as to the meaning of the regulations or what the mandate requires of them, and thus, we simply

cannot find that Plaintiffs have a reasonable likelihood of establishing that the regulations as

applied to them are vague. *See Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2720

(2010) ("[T]he dispositive point here is that the statutory claims are clear in their application to

plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must fail.");

*Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may

not successfully challenge it for vagueness.").

Nor can there be a due process violation based simply on the fact that the statute

delegates to administrative agencies the responsibility to promulgate implementing regulations.

*See Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (recognizing that "Congress simply

cannot do its job absent an ability to delegate power under broad general directives," and

upholding "Congress' ability to delegate power under broad standards").  Plaintiffs cite no

precedent to the contrary.  Accordingly, at this early stage of the litigation, we find that Plaintiffs

have failed to establish a likelihood of success on their Fifth Amendment Due Process claim.

### F.    Administrative Procedures Act

Finally, Plaintiffs claim that Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, by failing to follow the procedure set forth in § 553, which requires administrative agencies to: (1) publish notice of proposed rulemaking in the Federal Register; (2) "give interested parties an opportunity to participate in the rule making through submission of written data, views, or argument"; and (3) consider all relevant matter presented before adopting a final rule that includes a statement of its basis and purpose.[5]  5 U.S.C. § 553(b), (c).  Section 706 of the APA provides that courts "shall hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Specifically, Plaintiffs contend that Defendants "refus[ed] to satisfy their statutory duty to actually 'consider' objections issued during the comment period."  Pls.' Br. at 41.

We are not persuaded that Plaintiffs have established a reasonable likelihood of success on this claim.  On July 19, 2010, Defendants published the interim final regulations.  Although comments on the anticipated guidelines were not requested in the interim final regulations, Defendants received "considerable feedback" regarding which preventive series for women should be covered without cost sharing.  In response to these comments, on August 1, 2011, Defendants issued an amendment to the interim final regulations which authorized the religious employer exemption.  76 Fed. Reg. 46,621.  That amendment was issued pursuant to express statutory authority granting Defendants discretion to promulgate regulations relating to health

---

[5] In their Complaint, Plaintiffs also allege that the mandate violates the APA because: (1) Defendants arbitrarily and capriciously failed to consider the impact of the mandate on secular, for-profit employers and failed to exempt Plaintiffs and other similar organizations from the scope of the regulations; and (2) it conflicts with two federal prohibitions relating to abortions.  However, Plaintiffs failed to develop these allegations in their briefing in support of their motion for preliminary injunction, and thus, we do not consider them at this time.

coverage on an interim final basis, which means without requiring prior notice and comment. *Id.* at 46,624. Defendants also made a determination that issuance of the regulations in interim final form was in the public interest, and thus, there was "good cause" to dispense with the APA's notice-and-comment requirements. *Id.*

Defendants subsequently requested comments on the amendment for a period of 60 days and specifically on the definition of "religious employer" contained in the exemption authorized by the amendment and after receiving comments, adopted the definition contained in the amended interim final regulations and created the temporary enforcement safe harbor period during which they would consider additional amendments to the regulations to further accommodate the religious objections to providing contraception coverage of certain religious organizations. 77 Fed. Reg. at 8726-27. Plaintiffs have pointed to nothing that would suggest such actions are violative of the APA, and thus, we cannot find that Plaintiffs have a reasonable likelihood of establishing that Defendants failed to satisfy the APA's procedural requirements.

## III.   Conclusion

For the reasons detailed in this entry, we find that Plaintiffs have failed to establish a reasonable likelihood of success on the merits of any of their claims. Because likelihood of success is a threshold requirement for injunctive relief, we need not proceed further in our analysis. Accordingly, Plaintiffs' Motion for Preliminary Injunction is <u>DENIED</u>.

IT IS SO ORDERED.

Date: _____12/27/2012_____          _Sarah Evans Barker_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Matthew S. Bowman
ALLIANCE DEFENDING FREEDOM
mbowman@alliancedefendingfreedom.org

Michael J. Cork
BAMBERGER, FOREMAN, OSWALD AND HAHN, LLP
mcork@bamberger.com

Michael A. Wilkins
BROYLES KIGHT & RICAFORT, P.C.
mwilkins@bkrlaw.com

Bryan H. Beauman
STURGILL, TURNER, BARKER & MOLONEY, PLLC
bbeauman@sturgillturner.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov

Jacek  Pruski,
US DEPARTMENT OF JUSTICE
jacek.pruski@usdoj.gov